# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## AT LOUISVILLE

EMMANUEL J. QUARLES                                    PLAINTIFF

vs.                        CIVIL ACTION NO.  3:15-CV-00372-CRS-CHL

HARTFORD LIFE & ACCIDENT
INSURANCE COMPANY                                      DEFENDANT

## MEMORANDUM OPINION

### I.  INTRODUCTION

This matter is before the Court on cross-motions for judgment on the administrative record.[1]  DN 48; DN 49.  Plaintiff requests oral argument on the Parties' competing motions "[b]ased on the factually intensive nature of the issues presented, as well as the confusion that can occur when parties are filing competing motions."  DN 54, at 39.  Plaintiff's request will be denied, as this Court finds oral argument unnecessary.  The issues are clearly presented in the Parties' thorough briefs.  These issues are ripe for review.  For the reasons set forth below, the Court will **GRANT** Defendant's Motion for Judgment (DN 49) and **DENY** Plaintiff's Motion for Judgment (DN 48).

### II.  FACTUAL BACKGROUND

Plaintiff, Emmanuel J. Quarles ("Quarles"), brought suit against Defendant, Hartford Life and Accident Insurance Company ("Hartford") alleging wrongful termination of his long-term

---

[1] Although Plaintiff characterizes his motion as seeking "summary judgment," it is more appropriately captioned as a motion for judgment on the administrative record. *See Univ. Hosps. v. Emerson Elec. Co.*, 202 F.3d 839, 845 n. 2 (6th Cir. 2000) ("[S]ummary judgment generally is an inappropriate mechanism for adjudicating ERISA claims for benefits.") (citing *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 617–19 (6th Cir. 1998)).  Indeed, Plaintiff acknowledges his motion for "summary judgment" should be construed as a "motion for judgment on the administrative record."  *See* DN 54, at 3 n.1.

disability ("LTD") benefits and waiver of premiums ("WOP") of his basic life and accidental death and dismemberment ("AD&D") coverages under the Employment Retirement Income Security Act of 1974 ("ERISA"). The Administrative Record ("AR") of this matter has been filed. DN 21. The AR consists of 700 numbered pages which will be cited as "AR (page number)."

## A. Relevant Plan Provisions

In 2012, Quarles began to work as a Selector for Gordon Food Service, Inc. ("Gordon"). AR 621. Hartford issued Group Insurance Policies GL-395259, GLT-395259, and ADD-507325 to Gordon to insure the life insurance, LTD, and AD&D components, respectively, of the employee welfare benefit plan established and maintained by Gordon (the "Plan"). AR 1–112. By virtue of his employment with Gordon, Quarles was insured under the Life Policy, LTD Policy, and the AD&D Policy (collectively, the "Policies"). Each policy provides a benefit in the event Quarles became "Disabled." *Id.*

### 1. The LTD Policy

The LTD Policy pays disability benefits if participants:

1) become Disabled while insured under The Policy;
2) are Disabled throughout the Elimination Period;
3) remain Disabled beyond the Elimination Period; and
4) submit Proof of Loss to Us.

AR 22.[2] "Disability" for purposes of a participant's eligibility for disability benefits under the LTD Policy is defined as follows:

**Disability or Disabled** means You are prevented from performing one or more of the Essential Duties of:
1) Your Occupation during the Elimination Period;

---

[2] Under all the Policies, "**We, Our, or Us** means the insurance company named on the face page of The Policy." (*i.e.,* Hartford). AR 1, 15, 33, 40, 58, 75, 93 (emphasis in original). "**You or Your** means the person to whom this certificate is issued" and "**Your Occupation** means Your Occupation as it is recognized in the general workplace. Your Occupation does not mean the specific job You are performing for a specific employer or at a specific location." AR 33, 58, 93 (emphasis in original).

2) Your Occupation, for the 24 month(s) following the Elimination Period, and as a result Your Current Monthly Earnings are less than 80% of Your Indexed Pre-disability Earnings; and
3) After that, Any Occupation.

AR 30.

The LTD Policy provides that benefits terminate under the following relevant circumstances:

**Termination of Payment:** *When will my benefit end?*
Benefit payments will stop on the earliest of:
…
2) the date You fail to furnish Proof of Loss; [or]
…
8) the date Your Current Monthly Earnings exceed:
a) 80% of Your Indexed Pre-disability Earnings if You are receiving benefits for being Disabled from Your Occupation; or
b) the product of Your Indexed Pre-disability Earnings and the Benefit percentage if You are receiving benefits for being Disabled from Any Occupation…

AR 23 (emphasis in original).

Under the LTD Policy, Hartford "may request Proof of Loss throughout Your Disability. In such cases, [Hartford] must receive the proof within 30 day(s) of the request." AR 27. Proof of Loss is used to assist Hartford in determining if a participant is disabled under the conditions entitling participant to benefits under the LTD Policy. AR 26. The LTD Policy sets out a nonexclusive list of what Proof of Loss may include:

1) documentation of:
a) the date Your Disability began;
b) the cause of Your Disability;
c) the prognosis of Your Disability;
d) Your Pre-disability Earnings, Current Monthly Earnings or any income, including but not limited to copies of Your filed and signed federal and state tax returns; and
e) evidence that You are under the Regular Care of a Physician;
2) any and all medical information, including x-ray films and photocopies of medical records, including histories, physical, mental or diagnostic examinations and treatment notes;
3) the names and addresses of all:

    a) Physicians or other qualified medical professionals You have consulted;
    b) hospitals or other medical facilities in which You have been treated; and
    c) pharmacies which you have filled Your prescriptions within the past three years;

4) Your signed authorization for Us to obtain and release:
    a) medical, employment and financial information; and
    b) any other information We may reasonably require;

5) Your signed statement identifying all Other Income Benefits; and

6) proof that You and Your dependents have applied for all Other Income Benefits which are available.

AR 26.  The definition further explains that all "proof submitted must be satisfactory" to Hartford.

*Id.*

The LTD Policy provides that in the event a claim for benefits is denied, Hartford will provide "You" with written notification of the decision.  AR 27.  This written notification will:

1) give the specific reason(s) for the denial;

2) make specific reference to The Policy provisions on which the denial is based;

3) provide a description of any additional information necessary to perfect a claim and an explanation of why it is necessary; and

4) provide an explanation of the review procedure.

*Id.*  In order to appeal this decision, the participant:

1) must request a review upon written application within:
    a) 180 days of receipt of claim denial if the claim requires Us to make a determination of disability; or
    b) 60 days of receipt of claim denial if the claim does not require Us to make a determination of disability; and

2) may request copies of all documents, records, and other information relevant to Your claim; and

3) may submit written comments, documents, records and other information relating to Your claim.

*Id.*  Hartford "will respond to You in writing with Our final decision on the claim."  *Id.*

## 2. The Life and AD&D Policies

The Life and AD&D Policies provide for "Non-Contributory Coverage."  AR 42, 76.  Non-Contributory Coverage "means coverage for which You are not required to contribute toward the cost."  AR 57, 92.  Under the Life Policy, the Non-Contributory Coverage offered was Basic Life Insurance and Basic Dependent Life Insurance.  AR 42.  Similarly, under the AD&D Policy, Basic

AD&D Insurance and Basic Dependents' AD&D Insurance were offered as Non-Contributory Coverage. AR 76.

Participants of the Life and AD&D Policies can also enroll for "Contributory Coverage," which "means coverage for which You are required to contribute toward the cost." AR 57, 91. The Life Policy offered Supplemental Life Insurance and Supplemental Dependent Life Insurance as Contributory Coverage. AR 42. Similarly, under the AD&D Policy, Supplemental AD&D Insurance and Supplemental Dependents' AD&D Insurance were offered as Contributory Coverage. AR 76.

The Life and AD&D Policies provide for a waiver of premium ("WOP") benefit in the event a participant becomes disabled while insured:

> **Waiver of Premium**: *Does coverage continue if I am Disabled?*
> Waiver of Premium is a provision which allows You to continue Your and Your Dependent's [] Insurance coverage without paying premium, while You are Disabled and qualify for Waiver of Premium.

AR. 49, 81 (emphasis in original). In order to qualify for WOP benefits, "You" must:

> 1) be covered under The Policy and be under age 60 when You become Disabled;
> 2) be Disabled and provide Proof of Loss that You have been Disabled for 6 consecutive month(s), starting on the date You were last Actively at Work; and
> 3) provide such proof within one year of Your last day of work as an Active Employee.

AR. 49, 82. The Life and AD&D Policies both define "Disabled" as follows:

> Disabled means You are prevented by injury or sickness from performing one or more of the Essential Duties of:
> 1) Your Occupation, for 24 month(s); and
> 2) After that, Any Occupation.

AR 49, 81. The Life and AD&D Policies do not provide WOP benefits during the first six months a participant is Disabled. AR 49, 82. Once effective, WOP benefits continue "while You remain Disabled, until the date You attain Normal Retirement Age if Disabled prior to age 60." AR 50,

82.  Like the LTD Policy, the Life and AD&D Policies have continuing requirements to provide

Proof of Loss:

> We have the right to … require Proof of Loss that You are disabled. … If You fail
> to submit any required Proof of Loss…, then Waiver of Premium ceases.

AR 49–50; 82.  The Life and AD&D Policies include a similar nonexclusive list of what Proof of

Loss may include:

1) a completed claim form;
2) a certified copy of the death certificate (if applicable);
3) Your Enrollment form;
4) Your Beneficiary Designation (if applicable);
5) documentation of:
   a) the date Your Disability began;
   b) the cause of Your Disability;
   c) the prognosis of Your Disability;
6) any and all medical information, including x-ray films and photocopies of medical records, including histories, physical, mental or diagnostic examinations and treatment notes;
7) the names and addresses of all:
   a) Physicians or other qualified medical professionals You have consulted;
   b) hospitals or other medical facilities in which You have been treated; and
   c) pharmacies which you have filled Your prescriptions within the past three years;
8) Your signed authorization for Us to obtain and release medical, employment and financial information (if applicable); or
   a) Any other information We may reasonably require;
9) Any additional information required by Us to adjudicate the claim.

AR 54, 89.  Like the LTD Policy, "[a]ll proof submitted must be satisfactory" to Hartford.  *Id.*

## B.  Quarles's Medical History

In November 2012, Quarles stopped working due to knee and back pain from a work-related injury.  AR 622.  Quarles applied for LTD benefits on September 30, 2013, shortly after his worker's compensation benefits ended.  AR 167, 481–92.  On October 10, 2013, a WOP claim review was initiated under the Life and AD&D Policies.  AR 529.  A summary of Quarles's medical history follows.

Shortly after Quarles's injury, Quarles's primary care physicians ordered thoracic, lumbar, and right knee MRIs, which were completed on January 4, 2013. AR 436–38, 442–48. Dr. Anbu Nadar, an orthopedic surgeon, reviewed the right knee MRI and discussed possible arthroscopic evaluation of the knee. AR 441. This surgery was ultimately performed by Dr. Nadar on May 25, 2013. AR 420–21. Dr. Charles Crawford, a spine surgeon, reviewed the lumbar MRI on February 11, 2013 and recommended physical therapy and epidural steroid injections. AR 450–51. Dr. Crawford recommended surgery if those methods failed. AR 451. During a follow-up evaluation on May 17, 2013, after a second opinion with Dr. George Raque, Dr. Crawford concluded Quarles's "pain was not concordant with [his] previous diagnosis" and there was "no good indication for spine surgery." AR 461–62, 459.

On April 23, 2013, as part of his worker's compensation claim, Quarles underwent an Independent Medical Examination ("IME") conducted by Dr. Thomas M. Loeb. AR 338–48. Dr. Loeb diagnosed Quarles with a "medial meniscus tear in the right knee" and "degenerative disc disease of the lumbosacral spine." AR 344. Dr. Loeb concluded that Quarles had reached "maximum medical improvement" with regard to his lumbar spine, but not with his right knee. AR 344–45. However, Dr. Loeb opined that under certain circumstances, Quarles "could very well possibly return to his job as a Selector at Gordon Food Service." AR 348. Dr. Loeb further stated that Quarles would have "no problem whatsoever returning to his job as a disc jockey." AR 348. Dr. Loeb also noted that Quarles was using his cane on the "opposite side he should be using the cane for maximal assistance." AR 339.

On September 17, 2013, Dr. Nadar completed the "Attending Physician's Statement of Disability," which was submitted with Quarles's application for LTD benefits. AR 491–92. Mr. Quarles's primary diagnosis was a "torn medial meniscus right knee" with a secondary diagnosis

of "chondromalacia medial femoral condyle right knee." AR 491. Dr. Nadar stated Quarles had "[r]ecovered" from the May 25, 2013 knee surgery. AR 491. Next, Dr. Nadar assessed Quarles's functional capabilities "**based on [Dr. Nadar's] clinical assessment at the time [Quarles] stopped working or reduced work schedule.**" AR 492 (emphasis in original). Dr. Nadar concluded that Quarles can sit four hours at a time for a total of eight hours in a day, stand one hour at a time for a total of three hours a day, and walk one hour at a time for a total of three hours a day. AR 492. Quarles can frequently lift 20 pounds, occasionally lift 50 pounds, but is unable to lift over 50 pounds. AR 492. Dr. Nadar noted that Quarles's progress had "[i]mproved." AR 492.

On October 8, 2013, Quarles underwent a Functional Capacity Evaluation ("FCE"). AR 361–68. The FCE results indicated Quarles "performed in the Light Work Category" which "does not meet the physical demands of the job according to the formal report of job duties." AR 362. The main limiting factors during testing were complaints of low back pain and pain in bilateral knees. AR 362. The FCE also indicated that Quarles tested "significant for inconsistencies, indicating [Quarles] did not provide maximum and or consistent effort during testing." AR 363.

### C. Hartford's Approval of LTD and WOP Benefits

Hartford concluded the medical records supported Quarles's standing, walking, and lifting impairments, and he was disabled from performing his occupation which was classified as medium (exerting force of 20-50 pounds occasionally; 10-25 pounds frequently; or up to 10 pounds constantly). AR 157. Hartford noted that Quarles had a "significant degree of functionality" and rehab referral may be appropriate depending on the FCE results, which Hartford had yet to receive. AR 157.

By letter dated October 9, 2013, Hartford approved LTD benefits effective May 29, 2013. AR 213–17. Hartford also approved WOP benefits for "Basic" non-contributory coverages under the Life and AD&D Policies by letters dated October 24, 2013 and October 15, 2013, respectively. AR 498–503, AR 543–48. However, Hartford denied Quarles's claims for "Supplemental" contributory coverages under the Life and AD&D Policies for "non-payment of premium" by letters dated October 24, 2013 and October 23, 2013, respectively. AR 504, AR 549–59. The denial letters informed Quarles about his right to appeal Hartford's decision:

> If you do not agree with the reason why your claim was denied, in whole or part, and you wish to appeal your decision, [] write to us within one hundred eighty (180) days of the date of this letter.

AR 553, 558.

### D. Hartford's Continuing Review of Quarles's Claims

On January 3, 2014, Hartford received the results of the October 8, 2013 FCE and noted the results show that Quarles "did demonstrate some inconsistences but his overall functional level was scored in the light work category." AR 143–44. Hartford put in a request for Quarles's April 23, 2013 IME results conducted by Dr. Loeb, which Hartford received on January 31, 2014. AR. 144, 138–39. Upon review of the IME results, Hartford noted the IME indicated Quarles "is a disc jockey and that he is capable of performing his DJ job." AR 139. Because Quarles did not mention any other employers or any other income in his application for benefits, Hartford marked this discrepancy as a "red flag" in Quarles's record and ultimately referred his claim to its Special Investigations Unit ("SIU"). AR 139.

Hartford's SIU conducted four days of surveillance on Quarles between February 7, 2014 and March 10, 2014.  AR 307, 319–26.  The surveillance footage[3] from March 10, 2014 captured Quarles working at the restaurant Southern Express Soul Food located at 418 Oak Street in Louisville, Kentucky.  AR 322.  From the footage, Quarles can be seen taking out the garbage, standing behind the counter with other employees, and serving food to customers.  AR 322; SV 12:54-14:30 [3/10 – 11:26-11:28] (loading and taking out garbage can), SV 17:10-19:20 [3/10 – 13:32-13:35] (serving customers food from behind the counter), SV 19:20-25:02 [3/10 – 13:36-13:42] (standing behind the counter with other employees), SV 25:08-26:05 [3/10 – 13:43-13:44] (serving customers food from behind the counter), SV 26:05-27:00 [3/10 – 16:01-16:02] (taking out garbage can).

The investigation continued with an in-person interview with Quarles on April 2, 2014, during which SIU confirmed Quarles as the subject of the surveillance videos.  AR 280, 307.  During the interview, Quarles stated that the last time he performed as a DJ was March or April of 2013.  AR 298.  When Hartford probed Quarles about his employment while receiving disability benefits, Quarles circumvented questions and ultimately denied any recent work:

> Q: Okay.  Have you worked for any company, store, person, business or self-employed business while being on long term disability?
>
> A: Like worked as far as…
>
> Q: Any kind of…
>
> A: I mean, I go to restaurants and eat and chat, but you know…
>
> Q: Do you go to a restaurant to work?
>
> A: Like as far as…
>
> Q: Well, I mean, work, like a…either as an employee or a manager or…
>
> A: Oh, I'm not…

---

[3] The March 2014 surveillance footage was filed under seal as part of a supplement to the Administrative Record.  DN 22.  It will be cited as "SV __:__ [3/10 – __:__]" with the relevant minutes and seconds of the 28.5-minute video, followed in brackets by the internal date and time-stamp.

Q:  …in any way, shape or form.  Do you go…do you do any of that?

A:  I mean, I've put applications in, but I haven't, no.

Q:  And I want to be clear on making sure I'm understanding your answer.

A: Mm hmm.

Q:  And correct me if I'm wrong.  You don't work in a restaurant or have not worked in a restaurant, is that correct?

A:  I put applications in.

Q:  Right.  But you haven't actually worked there.

A:  No.

Q:  And you haven't actually been an employee, been hired, told to come in and do whatever. You just put applications…

A: Yes.

Q:  You applied for work.

A:  Right.

Q:  But you're not working.

A:  Right.

AR 299–300.

On May 27, 2014, SIU called Southern Express Soul Food and "was advised that the claimant works there" but was not working that day.  AR 687.  SIU sent a letter to Southern Express Soul Food requesting information about Quarles's date of hire, hours per week, wages and hours, and description of job title, duties, and required physical demands, but the restaurant did not respond.  AR 187, 687.  SIU also sent three letters to Quarles over the span of two months requesting the same information.  AR 186 (letter dated June 19, 2014), AR 185 (letter dated July 16, 2014), AR 183 (letter dated August 7, 2014).  The last letter warned "benefits will not be paid beyond August 28, 2014 if the requested information is not received," and failure to provide the information "may result in termination of your claim."  AR 183.

On August 27, 2014, Quarles called Hartford and asserted that his phone was "temporarily not working," and he "just checked his p.o. box" and saw the letters.  AR 120.  Quarles further

denied ever working at Southern Express Soul Food and asserted he was not currently working anywhere. AR 120. Hartford informed him that it had a video of him working and therefore needed his employment information to continue processing his claim. AR 120. If Hartford did not receive the information by the following day, it would close Quarles's claim. AR. 120. Hartford further advised Quarles he could reopen the claim by either submitting the requested information or appealing the termination. AR 120. Instead of submitting the requested information, Quarles submitted a letter, dated August 27, 2014, requesting a full copy of his file, including the surveillance video. AR 250–51. By letter dated September 11, 2014, Hartford provided a copy of the Administrative Record to Quarles. AR 176.

### E. Hartford's Termination of Quarles's Benefits

Nearly two weeks later, after receiving no additional information from Quarles, Hartford terminated Quarles's LTD and WOP benefits. The termination letters, each dated September 9, 2014, set out the relevant Plan provisions, including Proof of Loss and noted Quarles had not provided information regarding his employment with Southern Express Soul Food despite three letters requesting such information. AR 177–82 (letter re termination of LTD benefits), AR 534–37 (letter re termination of AD&D WOP benefits), AR 538–42 (letter re termination of Life WOP benefits). The letters explained that without such information, Hartford was unable to evaluate Quarles's disability. AR 181, 536, 541. Hartford advised Quarles that he may perfect his claims by submitting the previously requested information. AR 181, 536, 541. "Specifically, [Quarles] should send information regarding [his] employment with Southern Express Soul Food, to include [his] date of hire, hours worked per week, record of wages and hours worked, and description of [his] job title, essential duties and physical demands." AR 536, 541. *See also* AR 181. The letters

also advised Quarles of his right to appeal the decision without providing the requested information.  AR 181, 537, 542.

### F.  Quarles's Appeal of Hartford's Decision to Terminate Benefits

Quarles, through counsel, submitted a letter on February 16, 2015 appealing the termination of his LTD and WOP benefits.  AR 563–68.  The letter included "a non-exhaustive summary of the records supporting [Quarles's] ongoing disability," but did not provide the requested employment information.  AR 563–68.  Quarles's appeal letter further stated Hartford failed to provide reasons why it denied his claims and what information it needed to approve his claims.  AR 566.  Hartford upheld its terminations, by letters dated March 11, 2015, on the same grounds as stated in the original termination letters.  AR 172–73, AR 530–33.  On March 16, 2015, Quarles initiated this action for benefits under 29 U.S.C. §§ 1132(a)(1)(B) and (a)(3).  DN 1, at 3. This Court dismissed Quarles's § 1132(a)(3) claim in its May 17, 2016 Memorandum Opinion and Order.  DN 37.  The Court turns now to address Quarles's § 1132(a)(1)(B)[4] claim for benefits.

### III.  <u>STANDARD OF REVIEW</u>

In adjudicating an ERISA action, the Court reviews the merits of the action based solely upon the administrative record.  *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 619 (6th Cir. 1998).  Instead of applying the summary judgment standard, the Court applies either a *de novo*, or arbitrary and capricious standard based upon the policy language.  *Id.* at 616.  The Parties have stipulated to *de novo* review for purposes of this action.  *See* DN 33.  Therefore, the Court reviews the administrative record before Hartford at the time it made its decision and determines whether that decision was correct under the terms of the Plan.  *See Perry v. Simplicity Eng'g*, 900

---

[4] Section 1132(a)(1)(B) enables a participant or beneficiary of an insurance plan to bring a suit to "recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).

F.2d 963, 966 (6th Cir. 1990). The administrator's decision is accorded no deference or presumption of correctness. *Shelby Cnty. Health Care Corp. v. Majestic Star Casino*, 581 F.3d 355, 368 (6th Cir. 2009) (quoting *Hoover v. Provident Life and Acc. Ins. Co.*, 290 F.3d 801, 808–09 (6th Cir. 2002)).

## IV. <u>DISCUSSION</u>

### A. Quarles Failed to Exhaust His Supplemental Life and AD&D Claims

The first issue we address is whether Quarles's claims for WOP benefits under the Supplemental Life and AD&D policies is properly before this Court. At the time Quarles stopped working at Gordon, he was covered under Basic Life and Basic AD&D paid by Gordon, and Supplemental Life and Supplemental AD&D paid by Quarles. AR 514, 517. During the WOP review, however, Gordon informed Hartford that Plaintiff had stopped paying premiums on his Supplemental Life and Supplemental AD&D coverage as of March 15, 2013. AR 505, 577. Under the terms of the policies, WOP benefits were not effective during the first six months of Quarles's disability and his coverage terminated when premiums were "due but not paid." AR 47–48, 49, 80, 82. Because Quarles stopped paying premiums on the Supplemental coverages well before the six-month waiting period before WOP benefits were effective, Hartford terminated the Supplemental coverages and denied WOP benefits for those coverages by letters dated October 23, and 24, 2013. AR 549–58. Because Quarles did not appeal those determinations, the claims are not exhausted, and the Court will not consider the claims for Supplemental coverage. *Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 986 (6th Cir. 1991) ("The administrative scheme of ERISA requires a participant to exhaust his or her administrative remedies prior to commencing suit in federal court.").

Quarles does not dispute that he did not administratively appeal those adverse benefit determinations. Instead, Quarles counters that the claim should be deemed exhausted because "an appeal would be futile" given Hartford's determinations regarding the Basic Life and AD&D coverages. DN 54, at 7 (citing *Durand v. Hanover Ins. Grp., Inc.*, 560 F.3d 436, 443 (6th Cir. 2009) ("Administrative review of Durand's claim would be futile; and litigation of its merits should proceed without delay.")). This assumption is without merit. Hartford terminated the WOP benefits under the Supplemental and Basic coverages at separate times and for different reasons. Hartford denied the Supplemental claims in October of 2013 for nonpayment of premiums. AR 549–58. The Basic claims were not denied until nearly a year later, September of 2014, for failure to provide Proof of Loss. AR 534–42. Quarles does not provide the required "clear and positive indication of futility, such that it is certain that his claim will be denied on appeal." *Watkins v. Matrix Absence Mgmt., Inc.,* No. 3:15-CV-00716-JHM, 2015 WL 6480145, at *3 (W.D. Ky. Oct. 27, 2015). Accordingly, the Court finds that Quarles's ERISA claims with respect to the denial of WOP benefits under the Supplemental Life and AD&D coverages are precluded by Quarles's failure to exhaust his administrative remedies. The Court's remaining analysis focuses on his ERISA claims for LTD benefits under the LTD policy and WOP benefits under the Basic Life and Basic AD&D coverages.

**B. Hartford's Decision to Terminate Benefits was Correct**

As then District Court Judge Thapar put it: "[I]n an ERISA case, a plaintiff's claim 'stands or falls' on the terms of the deal he struck." *Carter v. Guardian Life Ins. Co. of Am.,* Civ. No. 11-3-ART, 2012 WL 4793690, at *4 (E.D. Ky. Oct. 9, 2012) (citing *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, 555 U.S. 285, 300 (2009). And in this ERISA case, Quarles's claims fall.

Under the terms of the Plan, Hartford had the right to request Proof of Loss throughout Quarles's disability.  AR 27, 49, 82.  Hartford exercised this right after surveillance footage discovered Quarles working at a restaurant, which he not only failed to disclose to Hartford, but also subsequently dodged and denied when Hartford specifically asked him at the in-person interview.  AR 299–300, 322.  Quarles frames the surveillance as a malicious attempt to "discredit" Quarles (DN 48, at 23), but a close review of the Administrative Record paints a different story.

Hartford initially approved Quarles's claims in October 2013.  AR 213–16, 543–44, 546–48.  However, on January 31, 2014, Hartford received Quarles's IME results conducted by Dr. Loeb.  AR 139.  Because those results indicated that Quarles was a disc jockey – a job that Quarles previously failed to disclose – Hartford referred his claim to SIU.  AR 139.  This record alone was sufficient to give rise to a suspicion that Quarles had been withholding information regarding his employment activities.  The surveillance footage of Quarles taking out the garbage, standing behind the counter, and serving customers at a restaurant, not only confirmed the suspicion that Quarles had been withholding information regarding his employment activities, but also gave rise to new suspicions regarding Quarles's physical capabilities.

Once SIU confirmed Quarles was in-fact an employee of Southern Express Soul Food (AR 687), Hartford commenced what later proved to be an impossible task of seeking Proof of Loss from Quarles in the form of information concerning his employment with the restaurant.  Hartford sent Quarles **three letters over the span of two months** requesting highly specific information regarding his employment:

1. Date of Hire
2. Hours worked per week
3. Record of wages and hours
4. Description of job title, duties, and required physical demands

*See* AR 186 (letter dated June 19, 2014), AR 185 (letter dated July 16, 2014), AR 183 (letter dated August 7, 2014). When Quarles failed to provide the requested information, Hartford determined that he was no longer in compliance with the Proof of Loss requirements of the Plan, and without this information Hartford was unable to determine if Quarles continued to meet the policy definitions of Disabled. AR 180, 536, 541. Hartford terminated Quarles's benefits, but gave him the option to perfect his claims by providing the requested information. AR 181, 536, 541.

Quarles continuously makes the bold assertion that Hartford conceded that Quarles is Disabled under the terms of the policies. *See e.g.*, DN 48, at 32 ("At no point has Hartford disputed that Mr. Quarles remains functionally unable to perform the essential duties of his occupation and is Disabled under the terms of the policies."). The termination letters clearly state that because Quarles failed to provide sufficient Proof of Loss, Hartford was "*unable to determine if [Quarles] continue[d] to meet the policy definition of Disabled.*" AR 180 (emphasis added); *See also* AR 536, 541. At no point did Hartford concede that Quarles was Disabled under the terms of the policy. Rather, Quarles's failure to provide Proof of Loss – which is required under the terms of the Plan – prevented Hartford from evaluating whether Quarles was Disabled. As was Hartford's right under the Plan.

Quarles further contends that given its prior approval of benefits, Hartford was required to prove a change in Quarles's physical capabilities to support reversing its position. DN 56, at 11–12. In support of this argument, Quarles relies on *McCollum v. Life Insurance Co. of North America*, 495 Fed. Appx. 694 (6th Cir. 2012). However, *McCollum* is explicit that Sixth Circuit precedent "does not create a rule that when a plan administrator suddenly changes course, the administrator must have new evidence of improvement." *Id.* at 704 (citing *Kramer v. Paul Revere Life Ins. Co.*, 571 F.3d 499 (6th Cir. 2009)). Rather, where a plan administrator has classified a

claimant as disabled *for years* and suddenly changes its determination, "the plan administrator must have some reason for the change based on any number of factors." *Id.* The Sixth Circuit went on to reverse the denial of benefits holding that the plan administrator had not provided any convincing reason for the change where it relied on the opinions of non-treating physicians who never physically examined the claimant; failed to conduct a physical examination of claimant when the only evidence in the record about the claimant's limitations were reports from his treating physicians who opined that he was disable; and conflated the distinction between light and sedentary work. *Id.* at 703–04.

*McCollum* is completely inapposite to the case here. First, Hartford had only been providing benefits for a little over a year compared to the eleven years in *McCollum*. *Id.* at 703. But more importantly, Hartford was never able to make a determination of whether Quarles continued to remain Disabled under the terms of the Plan because he failed to provide sufficient Proof of Loss. It cannot be said that Hartford suddenly changed its course. Instead, Hartford was employing its right to enforce the terms of the Plan.

Under the terms of the Plan, Quarles must continue to supply proof of continuing disability upon the request of Hartford. The Plan's terms specify that Proof of Loss is a conditioned precedent to the receipt of benefits and permits Hartford to request Proof of Loss throughout Quarles's disability. Requesting Proof of Loss is not only Hartford's right, but also its duty to all claimants. *See Dougherty v. Indiana Bell Tel. Co.*, 440 F.3d 910, 917 (7th Cir. 2006) ("The plan had a duty to all of its beneficiaries and participants to investigate ongoing claims…making sure to avoid paying benefits to claimants who were not entitled to receive them."); *Barnhart v. UNUM Life Ins. Co. of Am.*, 179 F.3d 583, 589 (8th Cir. 1999) ("A company failing to conduct proper inquiries into claims for benefits breaches its duty to all claimants as a fiduciary of the benefit

funds when it grants claims to unqualified claimants."). Quarles's failure to comply with threshold provisions, namely the Proof of Loss provisions, of the Plan is therefore sufficient grounds to terminate his claims for benefits. *See Wooden v. Alcoa, Inc.*, 511 App'x 477, 483 n.5 (6th Cir. 2013) (rejecting argument that review was improper because the plan terms grant the claim administrator a right of periodic examination to determine continued eligibility); *Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 985–86 (6th Cir. 1991) (rejecting argument that, once disability benefits are conferred, the burden of proof shifts to the claim administrator to prove that the claimant can return to work); *Carter,* Civ. No. 11-3-ART, 2012 WL 4793690, at *3 (E.D. Ky. Oct. 9, 2012) (claim administrator had no obligation to pay benefits where claimant failed to submit proof of loss).[5]  Based upon a review of the administrative record, the Court finds that Hartford's decision to terminate Quarles's LTD and WOP benefits was correct under the terms of the Plan.

### C. Hartford's Full and Fair Review

Next, Quarles asserts he was not provided a full and fair review under 29 U.S.C. § 1331 because Hartford failed to comply with certain provisions of the claims-procedure regulations in 29 C.F.R. § 2560.503-1.

29 U.S.C. § 1331 provides every employee benefit plan must:

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

The essential purpose of 29 U.S.C. § 1133 is twofold: "(1) to notify the claimant of the specific reasons for a claim denial, and (2) to provide the claimant an opportunity to have that decision

---

[5] Although these cases applied an arbitrary and capricious standard of review, this Court reaches the same conclusion applying the more stringent *de novo* standard in this case.

reviewed by the fiduciary." *Wenner v. Sun Life Assurance Co. of Can.*, 482 F.3d 878, 882 (6th Cir. 2007) (emphasis omitted).

The regulations under Section 1133 require that the notification of adverse benefit determination include, in pertinent part:

> (i) The specific reason or reasons for the adverse determination;
>
> (ii) Reference to the specific plan provisions on which the determination is based;
>
> (iii) A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary; …

29 C.F.R. § 2560.503-1(g)(1).

In determining whether a denial notice is sufficient, the Sixth Circuit has adopted a "substantial compliance" test that considers all the communications between the claim administrator and claimant and rests on the "crucial" determination of whether the administrator fulfilled the statute's "essential purpose" of notifying the claimant of the reasons for denying his claims and affording him a fair opportunity for review. *McCartha v. Nat'l City Corp.*, 419 F.3d 437, 444 (6th Cir. 2005).

Specifically, Quarles argues he was deprived a full and fair review because Hartford allegedly failed to inform him of the specific information it needed to perfect the claim and why the information was necessary. DN 48, at 32–37. After an extensive review of the Administrative Record, the Court finds that the claim communications are sufficient to fulfill the purpose of Section 1133. Each termination letter provides the relevant plan provisions and explains that the adverse decision is "based on a lack of sufficient proof of loss required to enable us to evaluate your disability." AR 181. *See also* AR 536, 541. The termination letter for Quarles's LTD benefits quoted the Plan's definition of, *inter alia*, Disabled requiring him to be unable to perform one or more of the Essential Duties of his occupation and meet the earnings requirement; noted

that Hartford had obtained footage of Quarles working at a restaurant and had requested information related to his employment with Southern Express Soul Food, specifically information regarding his: date or hire, hours worked per week, record of wages and hours worked, and description of job title, essential duties, and physical demands; and informed him that this information was necessary to determine whether he continues to be Disabled under the terms of policy. AR 177–82.

Similarly, the termination letters for Quarles's WOP benefits quoted the Plan's definition of, *inter alia*, Disabled requiring him to be unable to perform one or more of the Essential Duties of his occupation; noted that Hartford had previously requested the "description of your job title, essential duties and physical demands;" and informed him that this information was necessary to determine whether he continues to be Disabled under the terms of policy. AR 534–37, 538–42. All three termination letters inform Quarles that he can perfect his claim by providing the requested information, or his right to appeal the decision without providing the information. AR 181, 536–37, 541–42. Accordingly, the Court concludes that Hartford's communications sufficiently advised Quarles's of reasons for the denial of his claims, as well as his rights to review the decision. *See Lukpetris v. Hartford Life and Acc. Ins. Co.*, No. 5:05-cv-181, 2007 WL 1565759, at *8 (W.D. Mich. May 29, 2007) (concluding denial notice sufficient where claim administrator sent three letters explaining the plan requirement to the participant and advising him that his refusal to participate in the program was the reason for the termination).

### D. Hartford's "Open Dialogue"

Finally, Quarles chides Hartford for its alleged violation of the spirit of ERISA regulations by failing to have an "open dialogue" with Quarles. Frankly, the Court is not clear how Quarles can assert such a violation where Hartford sent three letters over the span of two months requesting

*highly specific information* regarding his employment that was necessary to determine whether Quarles continued to be Disabled under the terms of the Plan (AR 183, 185, 186) and gave him ample opportunity to respond *without a formal appeal* (AR 120, 181, 536, 541). Quarles was on notice that Hartford was seeking his employment information for two-and-a-half months prior to Hartford terminating his claims. Nevertheless, Quarles ignored those non-adversarial requests. When Hartford informed Quarles it was terminating his claims for failure to provide the previously requested information, which was necessary to determine his continued eligibility under the Plan (AR 181, 536, 541), Quarles appealed the decision without so much as an acknowledgement of Hartford's previous requests for his employment information (AR 563–68). If anyone closed the dialogue it was Quarles through his contumacy of the terms of the Plan.

## V. <u>CONCLUSION</u>

Accordingly, the Court will **GRANT** Defendant's Motion for Judgment (DN 49) and **DENY** Plaintiff's Motion for Judgment (DN 48).